IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ASSOCIATED MINORITY CONTRACTORS OF ARIZONA, et al.,
*Plaintiffs/Appellees,*

*v.*

CITY OF PHOENIX, et al., *Defendants/Appellants.*

No. 1 CA-CV 24-0658

FILED 02-27-2026

Appeal from the Superior Court in Maricopa County
No. CV2024-001435
The Honorable Bradley H. Astrowsky, Judge

**AFFIRMED**

COUNSEL

Perkins Coie LLP, Phoenix
By Jean-Jacques Cabou, Alexis E. Danneman, Karl J. Worsham, Jordan M. Buckwald
*Counsel for Defendants/Appellants*

Robert G. Schaffer PLC, Scottsdale
By Robert G. Schaffer
*Co-Counsel for Plaintiffs/Appellees*

Goldwater Institute, Phoenix
By Jonathan Matthew Riches
*Co-Counsel for Plaintiffs/Appellees*

Frazier Law, PLLC, Scottsdale
By John Thorpe
*Co-Counsel for Plaintiffs/Appellees*

Tempe City Attorney's Office, Tempe
By Eric C. Anderson, Clarence E. Matherson, Jr.
*Counsel for Amicus Curiae City of Tempe*

Arizona Attorney General's Office, Phoenix
By Joshua D. Bendor, Hayleigh S. Crawford, Joshua Katz
*Counsel for Amicus Curiae State of Arizona*

Snell & Wilmer LLP, Phoenix
By Brett William Johnson, Tracy Olson, Ian R. Joyce
*Counsel for Amicus Curiae AZLTA, et al.*

---

**OPINION**

Presiding Judge Michael S. Catlett delivered the opinion of the Court, in which Judge Daniel J. Kiley and Vice Chief Judge David D. Weinzweig joined.  Presiding Judge Catlett also filed a special concurring opinion.

---

**C A T L E T T**, Judge:

¶1        We resolve how two voter-approved, statewide ballot measures interact.  The first, enacted in 1984 by legislative referral, prohibits "political subdivisions" from making contractors or subcontractors pay at least "the prevailing rate of wages[.]"  S.C.R. 1001, 36th Leg., 2d Reg. Sess. (Ariz. 1984); A.R.S. § 34-321(B) (1984).   The second, enacted in 2006 by initiative, allows a "county, city, or town" to "regulate minimum wages . . . within its geographic boundaries[.]"  Ariz. Sec'y of State, *2006 Publicity Pamphlet*, 101 (2006), https://apps.azsos.gov/election/2006/info/ PubPamphlet/english/Guide.pdf; A.R.S. § 23-364(I) (2007).   We decide whether the 2006 law repealed the 1984 law, such that cities may again mandate that contractors pay prevailing wages.  Our answer is no.

2

**STATUTORY BACKGROUND**

**I.**

¶2   Prevailing wages appeared early in statehood.  In 1913, Arizona's Civil Code set an eight-hour workday for "all laborers, workmen, mechanics or other persons" the State or its political subdivisions employed.  Ariz. Civ. Code, § 3103 (1913).  These employees could not receive "less than the current rate of per diem wages in the locality where the work is performed[.]"  Ariz. Civ. Code, § 3103.  But the Code also treated certain private workers as government employees: "laborers, workmen, mechanics, and other persons doing manual or mechanical labor employed by contractors or sub-contractors" of the State or its political subdivisions.  Ariz. Civ. Code, § 3103.  These workers, too, had to receive at least the current rate of daily wages in the locality, called a "prevailing wage."

¶3   During the Great Depression, the federal government adopted a prevailing wage law.  To this day, the federal Davis-Bacon Act requires that laborers receive minimum hourly rates under certain federal contracts exceeding $2,000.  40 U.S.C. § 3142(a).  That Act requires federal contractors to pay "minimum wages" the Secretary of Labor "determines to be prevailing for the corresponding classes of laborers and mechanics employed on projects" like "the contract work in the civil subdivision of the State" where work is performed.  40 U.S.C. § 3142(b).

¶4   After the Davis-Bacon Act, states adopted "Little Davis-Bacon Acts."  Arizona was no exception.  In 1933, our legislature passed House Bill 37, codified at A.R.S. § 34-322, providing this:

> Every contract in excess of one thousand dollars in amount, to which the state of Arizona, or any political subdivision thereof, is a party, which requires or involves the employment of laborers or mechanics in the construction, alternation or repair of any public buildings, or other improvements of the state of Arizona or any political subdivision thereof, shall contain a provision to the effect that the rate of wages for all laborers and mechanics employed by the contractor or any subcontractor on such public buildings or improvements, shall be not less than the prevailing rate of wages for work of a similar nature in the county, city, town, village, or other civic division of the state in which the public building or improvement is located[.]

*See State v. Jaastad*, 43 Ariz. 458, 460–61 (1934) (quoting ch. 71, session laws of 1933); *see also Indus. Comm'n v. C&D Pipeline, Inc.*, 125 Ariz. 64, 65 (App. 1979) (calling the "Arizona Public Works Act, A.R.S. § 34-321, et seq." the "Little Davis-Bacon Act"). In 1979, we declared Arizona's Little Davis-Bacon Act unconstitutional for delegating too much legislative power to labor unions. *See C&D Pipeline, Inc.*, 125 Ariz. at 67.

¶5 Still, Arizona's Little Davis-Bacon Act lingered. But in 1984, the people buried it. The legislature referred Prop. 300; it passed in a statewide vote. *See* S.C.R. 1001, 36th Leg., 2d Reg. Sess. Prop. 300 declared that "the rates of wages paid under public works contracts . . . is of statewide concern." S.C.R. 1001, § 3; A.R.S. § 34-321(A) (1984). It repealed § 34-322 and amended § 34-321. After that, no public works contract could mandate that workers receive at least "the prevailing rate of wages[.]" S.C.R. 1001, §§ 2–3; A.R.S. § 34-321(B) (1984). We call § 34-321(B) "the Prevailing Wage Prohibition."

## II.

¶6 Arizona long deferred to federal law for its minimum wage. In 1938, Congress passed the Fair Labor Standards Act ("FLSA"), establishing a federal minimum wage at 25 cents an hour. 29 U.S.C. § 206(a)(1) (1938). At first, FLSA's coverage was narrow, applying only to employees engaged in interstate commerce or producing goods for commerce. 29 U.S.C. § 202(a) (1938). But later, Congress extended FLSA to most American workers.

¶7 For decades, Arizona did not adopt its own minimum wage, so only FLSA applied. In 1997, the Arizona Legislature passed A.R.S. § 23-362. Through that statute, "[t]he legislature declare[d] that the establishment of a uniform minimum wage is a matter of statewide concern." A.R.S. § 23-362(A) (1997). It prohibited political subdivisions from mandating higher minimum wages: "No political subdivision of this state may establish, mandate or otherwise require a minimum wage that exceeds the federal minimum wage[.]" A.R.S. § 23-362(B) (1997).

¶8 Between 1997 and 2007, the federal minimum wage stagnated. *Contrast* 29 U.S.C. § 206(a) (1996) *with* 29 U.S.C. § 206(a) (2007). Concerned Congress "refused to raise the Minimum Wage since 1996," the Arizona Minimum Wage Coalition pushed an initiative called the "Raise the Minimum Wage Act for Working Arizonans" ("the 2006 Act"). *2006 Publicity Pamphlet*, *supra*. Denominated Prop. 202, the 2006 Act passed in November 2006.

**¶9**        The 2006 Act repealed the prohibition on political subdivisions creating their own minimum wages. *2006 Publicity Pamphlet*, *supra*. It replaced one statutory section with new language and created two new sections. *See id.*; *see also* A.R.S. §§ 23-362 to -64 (2007). As amended, § 23-362 defined certain terms, including "wage," which it defined as "monetary compensation due to an employee by reason of employment[.]" A.R.S. § 23-362(E) (2007).

**¶10**        New § 23-363 required employers to "pay employees no less than the minimum wage, which shall be six dollars and seventy-five cents ($6.75) an hour beginning on January 1, 2007." A.R.S. § 23-363(A) (2007). It also increased "the minimum wage" in 2008 and 2009 "by the increase in the cost of living." A.R.S. § 23-363(B) (2007). And it clarified that an employer may pay "a wage up to $3.00 per hour less than the minimum wage" if an employee's tips and wages exceed "the minimum wage for all hours worked." A.R.S. § 23-363(C) (2007).

**¶11**        New § 23-364 created a civil enforcement action. A.R.S. § 23-364(A), (E) (2007). It let the legislature raise "the minimum wage." And it allowed counties, cities, and towns to do two things. First, they may "regulate minimum wages and benefits within" their "geographic boundaries." A.R.S. § 23-364(I) (2007). Second, they may "consider violations of [the 2006 Act] in determining whether employers may receive or renew public contracts[.]" A.R.S. § 23-364(I) (2007).

**¶12**        In 2016, the legislature amended a different wage law to define the phrase "minimum wage." 2016 Ariz. Sess. Laws, ch. 203, § 2(5) (2d Reg. Sess.) (H.B. 2579). The legislature defined "minimum wage" as "the nondiscretionary minimum compensation due an employee by reason of employment, including the employee's commissions, but excluding tips or gratuities." A.R.S. § 23-350(5) (2016).

**¶13**        Later in 2016, Arizonans again addressed the minimum wage. The Fair Wages and Healthy Families Act ("the 2017 Act") amended § 23-363 to increase the minimum wage after 2017. A.R.S. § 23-363(A) (2017). It also changed how employees earn and use sick time. *See* A.R.S. §§ 23-372 to -73 (2017). But it did not alter § 23-364(I), allowing counties, cities, and towns to "regulate minimum wages[.]" That subsection remains unchanged; we call it "the Local Permission Provision." *See* A.R.S. § 23-364(I) (2025).

5

**FACTUAL AND PROCEDURAL BACKGROUND**

¶14     In 2023, the Phoenix City Council ("Phoenix Council") considered a "Prevailing Wage Ordinance for City Projects."  That ordinance required businesses contracting with the City of Phoenix ("Phoenix") for construction projects costing at least $250,000 to pay certain employees "prevailing" wages.  The Phoenix Council enacted the ordinance.  But the Council quickly changed its mind and repealed it.

¶15     Two months later, the Arizona Attorney General ("Attorney General") opined that "[a] city may regulate the minimum wages paid within its geographic boundaries under Arizona Revised Statutes § 23-364(I)[.]"  Op. Ariz. Att'y Gen. I23-004, 1 (June 15, 2023), https://www.azag.gov/sites/default/files/2025-06/I23-004.pdf.   The Attorney General reasoned that "[t]he plain text and context in which the Minimum Wage law was enacted support" interpreting "the Minimum Wage statute as exempting counties, cities, and towns from" "the Prevailing Wage statute's earlier prohibition."  Id. at 8.  To the Attorney General, a city can regulate wages "to require that employees of contractors on local public works projects be paid not less than the prevailing wage."  Id. at 1.

¶16     After the Attorney General's opinion, the Phoenix Council passed a new prevailing wage ordinance ("the Phoenix Ordinance").  It requires a contractor or subcontractor under certain contracts costing more than $4 million to pay its workers "not less than the Prevailing Wage Rate for the same class and kind of work in the Phoenix metropolitan area."  To determine the "Prevailing Wage Rate," the Phoenix Ordinance defers to the United States Secretary of Labor's wage rates under the Davis-Bacon Act.  That same day, the Tucson City Council passed Ordinance Number 12066 ("the Tucson Ordinance") with language like the Phoenix Ordinance (collectively, "the Prevailing Wage Ordinances"), but covering contracts totaling "no less than $2 [million.]"  In this way, Phoenix and Tucson (collectively, "the Cities") created their own Little Davis-Bacon Acts.

¶17     The Associated Minority Contractors of Arizona, Arizona Chapter of the Associated General Contractors of America, and Arizona Builders Alliance (collectively, "the Minority Contractors") sued to enjoin the Prevailing Wage Ordinances.  The Minority Contractors claimed the Prevailing Wage Prohibition remains good law after the Local Permission Provision, so the Cities still cannot mandate prevailing wages.

¶18     The Cities moved to dismiss, arguing the Local Permission Provision now lets them regulate minimum wages, and the Prevailing Wage Ordinances do so.  The Minority Contractors moved for summary

judgment. The superior court denied the Cities' motion to dismiss and granted summary judgment for the Minority Contractors, concluding a prevailing wage is not a minimum wage. The court declared the Prevailing Wage Ordinances unlawful and enjoined them.

¶19 The Cities timely appealed; we have jurisdiction. *See* A.R.S. § 12-120.21(A)(1).

## DISCUSSION

¶20 The Cities challenge summary judgment. They argue the superior court misinterpreted the phrase "minimum wages" by concluding a prevailing wage is not a minimum wage. We review "a grant of summary judgment de novo." *Joshua Tree Health Ctr., LLC v. State*, 255 Ariz. 220, 222 ¶ 8 (App. 2023). The parties agree on the facts, leaving only legal issues, which we review de novo. *Fann v. State*, 251 Ariz. 425, 432 ¶ 17 (App. 2021). For the Minority Contractors to get declaratory relief, they must have the law right. *See* A.R.S. § 12-1832. And to get a permanent injunction, they must show: (1) they prevail on the merits; (2) damages are inadequate; (3) the balance of hardships favors them; and (4) public policy favors them. *Brown v. City of Phoenix*, 258 Ariz. 302, 308 ¶ 17 (App. 2024).

¶21 The Cities posit that the 2006 Act impliedly repealed the Prevailing Wage Prohibition. They think a prevailing wage is a type of minimum wage, so the Local Permission Provision and the Prevailing Wage Prohibition conflict: the former allows the Prevailing Wage Ordinances and the latter prohibits them.

¶22 The Minority Contractors challenge that premise—they say a prevailing wage is not a minimum wage. They maintain their interpretation leaves both statutes intact. To them, the Local Permission Provision lets cities regulate wages for all employees in a geographic area, but it does not let cities mandate prevailing wages. The Minority Contractors also argue the Prevailing Wage Ordinances violate due process.

## I.

¶23 The parties spill much ink debating whether a prevailing wage generally is a type of minimum wage. The superior court concluded a prevailing wage is not a minimum wage, reasoning that an "overlap in the colloquial meaning of the word 'minimum' does not mean that 'minimum wage laws,' . . . encompass[] 'prevailing wage laws.'"

¶24 Regardless of whether a prevailing wage can ever qualify as a minimum wage, we answer a more-specific question tied to statutory text:

did the Local Permission Provision use the phrase "minimum wages" in a manner that includes prevailing wages? We conclude the Local Permission Provision did not do so, and thus the Prevailing Wage Prohibition still bars the Prevailing Wage Ordinances.

**A.**

**¶25** Answering the question posed requires statutory interpretation. "[W]e apply the same interpretive standards to initiatives as we do to statutes." *State v. Green*, 248 Ariz. 133, 135 ¶ 9 (2020). "The primary purpose in construing a voter initiative is to effectuate the intent of the electorate that adopted it." *Id.* (cleaned up).

**¶26** "The most reliable indicator of that intent is the language of the statute, and if it is clear and unambiguous, we apply its plain meaning and the inquiry ends." *State v. Jones*, 246 Ariz. 452, 454 ¶ 5 (2019). "Statutory terms must be given effect in accordance with their commonly accepted meanings[.]" *Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 142 ¶ 16 (2024).

**¶27** We analyze "the entire text, considering the context and related statutes on the same subject." *Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019). "Context is *always* relevant" because when "a provision is part of a broader statutory scheme"—as most provisions are—"context can tell us the overall objective." *In re Chalmers*, ___ Ariz. ___, ___ , 571 P.3d 885, 889 ¶ 18 (2025). So when construing a specific provision, we consider the whole statute and statutes of the same subject or general purpose. *In re Drummond*, 257 Ariz. 15, 18 ¶ 5 (2024).

**¶28** "When a statute's plain language is unambiguous in context, it is dispositive." *Drummond*, 257 Ariz. at 18 ¶ 5. But if statutory language "can be reasonably read in two ways," we can look to "alternative methods of statutory construction" like "the [statute's] historical background, its spirit and purpose, and the effects and consequences of competing interpretations." *Planned Parenthood*, 257 Ariz. at 142 ¶ 17.

**B.**

**¶29** The Cities say a minimum wage sets a wage floor and the Prevailing Wage Ordinances do too for some employees, so the Ordinances regulate minimum wages. The Local Permission Provision says a city may "regulate minimum wages and benefits within its geographic boundaries but may not provide for a minimum wage lower than that prescribed in this article." A.R.S. § 23-364(I). Neither the Local Permission Provision nor the

2006 Act define the full phrase "minimum wages." But the 2006 Act defines part of that phrase. It says a "wage" is "monetary compensation due to an employee by reason of employment, including an employee's commissions, but not tips or gratuities." A.R.S. § 23-362(E) (2007). The Cities posit that a prevailing wage meets that definition.

¶30 According to the Cities, to define the full phrase "minimum wages," all we need to do is take the statutory definition of "wage" and add it to the dictionary definition of "minimum." Quoting Black's Law Dictionary, the Cities say, "the ordinary meaning of 'minimum' is 'the smallest acceptable or possible quantity in a given case.'" Taking that meaning of "minimum" and adding it to the definition of "wage," the Cities claim prevailing wages are minimum wages.

¶31 The Cities get textualism wrong. Textualism is not a math equation where the whole always equals the sum of its literal parts. When interpreting text, the meaning of two or more combined words sometimes means something different than the sum of its parts. Idioms are an example. Consider this phrase: "goes down in flames." Combining the sum of its individual parts, that phrase has this literal meaning: to move toward a lower position while surrounded by a hot glowing body of ignited gas. But in common parlance, it can mean something else—to fail suddenly and spectacularly. Picking among that phrase's meanings—literal vs. idiomatic—requires context. If referring to a meteor, the literal meaning applies; if referring to a losing legal argument, the idiomatic does.

¶32 Our supreme court has warned against interpreting statutes like the Cities urge. *See State v. Serrato*, 259 Ariz. 493, ___ ¶ 15 (2025). The question in *Serrato* was whether arson of an occupied structure included the arsonist's presence. *Id.* at ___ ¶¶ 11–12. The statute said an "'occupied structure' is one 'in which one or more human beings either is or is likely to be present or so near as to be in equivalent danger at the time the fire or explosion occurs.'" *Id.* ¶ 12 (quoting A.R.S. § 13-1701(2)). Unsurprisingly, dictionary "definitions confirm[ed] that 'human being' encompasses all people." *Id.* ¶ 13. So an arsonist igniting a structure would do so to an occupied structure. *Id.* ¶ 14. But the court rejected that interpretation. *Id.* ¶ 15. It advised against "conflat[ing] textualism with literalism." *Id.* And it rejected "strict constructionism," which adopts "a narrow, crabbed reading." *Id.* It said courts must instead use textualism, which "does not limit one to the *hyperliteral meaning of each word in the text*." *Id.* (emphasis added) (cleaned up).

¶33 So we cannot simply take the literal meaning of "minimum," add it to the statutory meaning of "wage," and see what materializes. We

9

must instead determine the full-phrasal meaning of "minimum wages" as used in context.

## C.

**¶34**        To obtain the common meaning of the full phrase "minimum wages," we may look to dictionary definitions. *See Planned Parenthood*, 257 Ariz. at 142 ¶ 16. Here, those definitions cut both ways.

**¶35**        Some dictionaries support the Cities. Merriam Webster defines a "minimum wage" as "a wage fixed by legal authority *or by contract* as the least that may be paid either to employed persons generally *or to a particular category of employed persons*." *Minimum Wage*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/minimum %20wage (last visited Feb. 24, 2026) (emphasis added). And Collins defines the phrase as "the lowest wage that an employer is allowed to pay an employee, according to a law *or agreement*." *Minimum Wage*, Collins, https://www.collinsdictionary.com/ dictionary/english/minimum-wage (last visited Feb. 24, 2026) (emphasis added). These definitions support the Cities—a prevailing wage is the lowest wage an employer may pay some employees for work under certain contracts with a public entity.

**¶36**        Other dictionaries support the Minority Contractors. The Cambridge Dictionary defines a "minimum wage" as "the smallest amount of money that employers are legally allowed to pay someone who works for them." *Minimum Wage*, Cambridge Dictionary, https://dictionary .cambridge.org/dictionary/english/minimum-wage (last visited Feb. 24, 2026). And the Oxford Learner's Dictionaries define "minimum wage" as "the lowest wage that an employer is allowed to pay by law." *Minimum Wage*, Oxford Learner's Dictionaries, https:// www.oxfordlearnersdictionaries.com/definition/english/minimum-wage (last visited Feb. 24, 2026). These definitions support the Minority Contractors—neither necessarily include wages paid after *voluntarily* contracting with the government.

**¶37**        We will not cherry-pick which dictionary definition we prefer. That would be like "entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring). Doing so is fine for party goers but not for neutral arbiters of legal disputes. Dictionaries are a dead end.

**D.**

¶38 There is good news: "inconclusive dictionary definitions do not render [a phrase] ambiguous." *Drummond*, 247 Ariz. at 19 ¶ 9. Instead, "[w]hen dictionary definitions are unavailing, . . . context is critical." *Id.* at 18 ¶ 7. Context provides a path out. Reading the phrase "minimum wages" in context "dispels any purported ambiguity[.]" *Id.* at 19 ¶ 9.

**1.**

¶39 The 2006 Act repeatedly used the phrase "the minimum wage." *See* A.R.S. §§ 23-362 to -64 (2007). By using a definite article "the" before "minimum wage," the 2006 Act signals that "minimum wage" refers to a particular type of compensation. *See Smith v. Melson, Inc.*, 135 Ariz. 119, 121 (1983). And the 2006 Act clarified what type of compensation that is.

¶40 The 2006 Act used "the minimum wage" to denote the nondiscretionary minimum amount of hourly compensation an employer must legally pay all employees because of employment. The 2006 Act made employers "pay employees no less than the minimum wage," which the Act defined as "six dollars and seventy-five cents ($6.75) an hour." A.R.S. § 23-363(A) (2007). So no matter what work an employee performed, their employer had to pay at least $6.75 an hour in 2007. And that requirement triggered once an employment relationship existed.

¶41 The 2006 Act also provided that "the minimum wage" would increase annually. A.R.S. § 23-363(B) (2007). Again, "the minimum wage" referred to the minimum hourly amount an employer legally must pay employees because of employment. A.R.S. § 23-363(A) (2007).

¶42 The 2006 Act exempted "any employee who customarily and regularly receives tips or gratuities from patrons or others[.]" A.R.S. § 23-363(C) (2007). For those employees, the Act set the minimum wage at $3.75 an hour if an employer proved an employee received at least $3.00 an hour in tips. A.R.S. § 23-363(C) (2007). In this way, the 2006 Act let customers subsidize the minimum hourly amount employers paid. *See* A.R.S. § 23-363(C) (2007). But that exception did not alter that "the minimum wage" was the minimum amount ($6.75 beginning January 1, 2007) employers legally had to pay all employees because of employment. If customer tips fell short, the employer remained on the hook.

¶43 The 2006 Act also required employers to "post notices in the workplace . . . notifying employees of their rights[.]" A.R.S. § 23-364(D) (2007). And if an employer did not do so, that would "raise a rebuttable

presumption that the employer did not pay the required minimum wage rate." A.R.S. § 23-364(D) (2007). "[T]he required minimum wage rate" again referred to the minimum hourly rate an employer legally had to pay because of employment. *See* A.R.S. §§ 23-363(A) (2007); 23-364(D) (2007).

¶44 Finally, the 2006 Act let the legislature "raise the minimum wage established" in the Act. A.R.S. § 23-364(I) (2007). This may sound repetitive, but "the minimum wage" here again referred to the minimum hourly amount an employee legally had to receive for performing work.

**2.**

¶45 In the same subsection (I), the 2006 Act housed the Local Permission Provision. A.R.S. § 23-364(I) (2007). It did not mention "the minimum wage." It said, "A county, city, or town may by ordinance regulate *minimum wages*[.]" A.R.S. § 23-364(I) (2007) (emphasis added). The Local Permission Provision used the plural phrase "minimum wages," not a definite phrase.

¶46 But "minimum wages" in the 2006 Act most naturally referred to "the minimum wage" in each county, city, or town (i.e., in the geographic area). Consider this example: Flagstaff raises "the minimum wage" in the city to $18.00 an hour. And Pima County raises "the minimum wage" in the county to $20.00 an hour. The 2006 Act allowed them to do so. But one would refer collectively to those differing wage rates as "minimum wages," not "the minimum wage." So the 2006 Act's shift to plural language when conferring power across multiple local governments did not alter that the 2006 Act governs the minimum hourly amount employers must legally pay all employees because of employment. In other words, "the minimum wage" and "minimum wages" had similar meanings—the only difference being that the former established the statewide minimum wage and the latter conferred power to enact minimum wages in smaller geographic areas. That local power must be understood in the context of the 2006 Act as a whole. *Drummond*, 257 Ariz. at 18 ¶ 5 (we consider the whole statute).

¶47 The rest of the sentence using the phrase "minimum wages" supports our conclusion. That sentence's second half said a county, city, or town "may not provide for a minimum wage lower than that prescribed in this article." A.R.S. § 23-364(I) (2007). "[A] minimum wage" there referred to "the minimum wage," $6.75 an hour, the minimum hourly rate an employer had to pay because of employment.

¶48        The 2006 Act also let political subdivisions "consider violations of this article in determining whether employers may receive or renew public contracts[.]"  A.R.S. § 23-364(I) (2007).  This tells us two things.  One, the 2006 Act let political subdivisions consider a failure to pay "the minimum wage" when awarding public contracts.  But, again, "the minimum wage" is the minimum hourly rate employers are required to pay employees because of the employment relationship (even if those rates differ by geographic area).  Two, the 2006 Act authorized cities to condition "public contracts" on compliance with "the minimum wage" but conferred no broader authority over such contracts.  *See* A.R.S. § 23-364(I) (2007).  So the 2006 Act impacted no other limit on political subdivisions' authority over public contracts, including the Prevailing Wage Prohibition.

**3.**

¶49        Finally, we consider other statutes *in pari materia* with the 2006 Act.  One is relevant.  In 2016, the legislature amended Arizona's wage laws to define the phrase "minimum wage."  A.R.S. § 23-350(5) (2017).  Like the 2006 Act, those laws govern employee compensation, and thus the 2006 Act and the wage laws are *in pari materia*—they are "of the same subject or general purpose[.]"  *See Stambaugh*, 242 Ariz. at 509 ¶ 7; A.R.S. §§ 23-350 to -62; *see also State Farm Auto. Ins. Co. v. Orlando*, 259 Ariz. 531, 537 ¶ 24 (2025).  The Cities do not fight the legislature's definition—they embrace it.  That definition is this: "'[m]inimum wage' means the nondiscretionary minimum compensation due an employee by reason of employment, including the employee's commissions, but excluding tips or gratuities."  A.R.S. § 23-350(5) (2017).

¶50        That definition lines up with how the 2006 Act used the phrases "the minimum wage" and "minimum wages."  Like the 2006 Act, § 23-350 defined "minimum wage" as the minimum hourly rate employers are required to pay employees because of the employment relationship.  With this, our destination is clear.

¶51        And that end point is this: the 2006 Act used the phrases "the minimum wage" and "minimum wages" to mean the minimum hourly rate all employers in a particular geographic area must legally pay all employees once an employment relationship exists.

**E.**

¶52        Having arrived there, we now determine whether the wages mandated under the Prevailing Wage Ordinances qualify as "minimum wages" under the Local Permission Provision.  They do not.

¶53        From an employee's perspective, the Prevailing Wage Ordinances do not automatically result in minimum hourly pay rates upon employment. Under those Ordinances, employees receive a prevailing wage only when they work on certain public projects. The Ordinances apply only to a subset of workers working on a subset of projects. Most prominently, they apply only when a public contract exceeds certain values—$4 million for the Phoenix Ordinance, $2 million for the Tucson Ordinance. Plus, the Prevailing Wage Ordinances have more exceptions. The Phoenix Ordinance lists nine; the Tucson Ordinance lists eight. And the Ordinances apply only to mechanics, laborers, or other workers when the United States Secretary of Labor has established a prevailing wage.

¶54        So simply gaining employment does not earn an employee a prevailing wage. He must instead work for a company having a contract with Phoenix or Tucson exceeding the minimum value triggering the Prevailing Wage Ordinances. That contract must avoid all other exceptions in the Ordinances. He must work on a project subject to the Ordinances—working on a private project is insufficient. And he must perform a type of work entitled to a prevailing wage. Once narrowed this way, it can hardly be said that the Prevailing Wage Ordinances legally entitle all employees to minimum hourly pay rates because of an employment relationship.

¶55        From an employer's perspective, the Prevailing Wage Ordinances do not legally require prevailing wages until it enters a qualifying contract with the Cities. Whether an employer does so is *discretionary*—an employer subjects itself to the Ordinances only by entering a contract with Phoenix or Tucson exceeding certain values ($4 million in Phoenix; $2 million in Tucson) and not otherwise exempt. Even then, an employer need not pay any employee a prevailing wage until it assigns him to a project subject to the Prevailing Wage Ordinances. Because the Prevailing Wage Ordinances do not *legally require* an employer to pay a prevailing wage until they voluntarily enter a qualifying contract and assign an employee to perform certain work on that contract, the Ordinances do not "regulate minimum wages" under the 2006 Act.

**F.**

¶56        Even if the phrase "minimum wages" was ambiguous, the Minority Contractors would prevail. Again, when text is ambiguous, "we may use alternative methods of statutory construction, including examining the [statute's] historical background, its spirit and purpose, and the effects and consequences of competing interpretations." *Planned Parenthood*, 257 Ariz. at 142 ¶ 17.

¶57          Start with statutory history.  Before the 2006 Act, Arizona law said political subdivisions could not "establish, mandate or otherwise require a minimum wage that exceeds the federal minimum wage[.]" A.R.S. § 23-362(B) (1997).  That subsection did not address—either way—political subdivisions' authority to contractually mandate prevailing wages.  This is because, starting in 1984, the Prevailing Wage Prohibition applied.  The 2006 Act expressly repealed only the section prohibiting a county, city, or town from setting its own minimum wage.  And the 2006 Act should be understood with reference to the prohibition it repealed and replaced; that prohibition did not cover prevailing wages, which the people separately banned in 1984.  *See* A.R.S. § 34-321(B).

¶58          The 2006 Act's purpose also cuts against the Cities' interpretation.  The 2006 Act described its "[p]urpose and intent."  2006 Publicity Pamphlet, *supra,* § 2.  Section 2 said the "purpose in enacting the Act" is that "[a]ll working Arizonans deserve to be paid a minimum wage that is sufficient to give them a fighting chance to provide for their families."  *Id.* § 2(1).  Moreover, "[i]ncreasing the minimum wage reduces dependency on taxpayer-funded public services."  *Id.* § 2(4).

¶59          Interpreting the 2006 Act to allow local governments to require all employers to pay employees certain wages only because of employment directly furthers those purposes.  But allowing local governments to contractually require prevailing wages for certain employees performing certain work on certain projects does not.  For example, if Phoenix requires all employers to pay all employees at least $18.00 an hour, that arguably benefits "[a]ll working" Phoenicians and reduces their "dependency on taxpayer funded public services."  *Id.* § 2(1), (4).  Requiring some employers to pay some employees an increased hourly rate when those employers enter certain contracts (worth more than $4 million) does not benefit "[a]ll working" Phoenicians.  *Id.* § 2(1).  That benefits only a subset of the City's citizens when they perform certain work on a subset of projects.

¶60          Lastly, the effects and consequences of the Cities' interpretation militate against it.  That interpretation would grant the Cities broad power.  With that power, the Cities could dictate how much any employer pays any employee anytime an employer contracts or subcontracts with the Cities.  Put differently, the Cities by ordinance could dictate pay whenever an employee works under a public contract, regardless of the contract's value or the nature of the work performed. From a policy perspective, some might think the Cities should have this power.  Others might find this power objectionable.  We do not take policy positions, so we are agnostic.  But regardless of one's policy views,

interpreting the 2006 Act to grant such power does not align well with the Act's history or purposes.

¶61 So the Cities prevail only if the Local Permission Provision unambiguously uses the phrase "minimum wages" as they claim. That Provision does not do so.

## II.

¶62 The Cities argue the Local Permission Provision impliedly repealed the Prevailing Wage Prohibition. The Cities maintain those laws contradict because the former allows prevailing wages and the latter prohibits them. They claim the Local Permission Provision is more recent and specific, so it impliedly repealed the Prevailing Wage Prohibition. Because we conclude the Local Permission Provision does not allow the Cities to mandate prevailing wages, implied repeal does not apply.

¶63 We disfavor implied repeal. *See e.g.*, *Jurju v. Ile*, 255 Ariz. 558, 562 ¶ 21 (App. 2023). But if statutes "cannot be harmonized to give each effect and meaning," we may find an implied repeal. *Id.* (quoting *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 7 ¶ 24 (2013)).

¶64 Our interpretation lets both laws cohabit. Again, the Local Permission Provision uses "minimum wages" to mean "the minimum hourly rate all employers in a particular geographic area must legally pay all employees once an employment relationship exists." *Supra* ¶ 51. And "a prevailing rate of wages" does not meet that definition. *Supra* ¶¶ 52–55. Vice versa, the Prevailing Wage Prohibition does not touch the Cities' power to "regulate minimum wages," at least as the Local Permission used that phrase. The Local Permission Provision and the Prevailing Wage Prohibition coexist peacefully; implied repeal does not apply. *See Hounshell v. White*, 219 Ariz. 381, 391 ¶ 40 (App. 2008).

## III.

¶65 The Cities also argue the Local Permission Provision repealed the Prevailing Wage Prohibition under A.R.S. § 1-245. That statute says a former statute is "deemed repealed and abrogated" "in all cases provided for by [a] subsequent statute," regardless of whether the former statute is "consistent or not with the provisions of the subsequent statute[.]" A.R.S. § 1-245. But "[o]ur implicit repeal jurisprudence is inextricably intertwined with § 1-245's substantive command." *In re Riggins*, 257 Ariz. 28, 34 ¶ 33 (2024). Put differently, "the doctrine of implicit repeal provides the mechanism by which . . . courts" "determine whether a subsequent statute

'provide[s] for' the same 'cases' as a former statute, a necessary prerequisite for applying § 1-245." *Id.* By deciding whether two laws conflict, we also answer whether § 1-245 applies. *Id.*

**¶66** Our implied repeal conclusion makes § 1-245 irrelevant. The Local Permission Provision does not address cases provided for by the Prevailing Wage Prohibition. The latter forbids the Prevailing Wage Ordinances; the former does not. So the Local Permission Provision did not repeal the Prevailing Wage Prohibition under § 1-245.

## ATTORNEY FEES

**¶67** The Minority Contractors request attorney fees and costs on appeal under A.R.S. §§ 12-341 and 12-348 and the private attorney general doctrine. We deny their request under § 12-348 because they do not identify the subsection entitling them to fees, nor do they explain why they are entitled to fees. *See Ferneau v. Wilder*, 256 Ariz. 68, 76 ¶ 27 (App. 2023). We also deny the Minority Contractors' request under the private attorney general doctrine because they do not explain how they meet that doctrine's requirements. *See Ariz. All. for Retired Ams., Inc. v. Crosby*, 256 Ariz. 328, 334 ¶ 20 (App. 2023). But as the prevailing party, we award the Minority Contractors costs on appeal upon complying with Arizona Rule of Civil Appellate Procedure 21. *See* A.R.S. § 12-341.

## CONCLUSION

**¶68** The Local Permission Provision does not permit the Prevailing Wage Ordinances. And the Local Permission Provision did not repeal the Prevailing Wage Prohibition. With these conclusions, we need not address the Minority Contractors' due process arguments. We affirm the judgment.

**C A T L E T T**, Judge, specially concurring:

**¶69**    I have three more points to make.

**I.**

**¶70**    The first concerns how we interpret statutes born from ballot measures. As the opinion explains, our supreme court instructs that "[t]he primary purpose in construing a voter initiative is to effectuate the intent of the electorate that adopted it." *State v. Green*, 248 Ariz. 133, 135 ¶ 9 (2020) (quotation marks omitted); *see also Calik v. Kongable*, 195 Ariz. 496, 498 ¶ 10 (1999). And this court has dutifully applied that maxim when interpreting initiatives, even recently. *See Ctr. for Ariz. Pol'y, Inc. v. Ariz. Sec'y of State*, 258 Ariz. 570, 583 ¶ 36 (App. 2024).

**¶71**    Once upon a time, the supreme court also instructed that we determine legislative intent when interpreting statutes. *See Ariz. Dep't of Revenue v. Action Marine, Inc.*, 218 Ariz. 141, 143 ¶ 10 (2008); *Premier Physicians Grp., PLLC v. Navarro*, 240 Ariz. 193, 195 ¶ 9 (2016). Recently though, the court steered away from legislative intent and embraced text and context. We are now instructed to "determine the meaning of the words the legislature chose to use . . . according to the plain meaning of the words in their broader statutory context, unless the legislature directs . . . otherwise." *S. Ariz. Home Builders Ass'n v. Town of Marana*, 254 Ariz. 281, 286 ¶ 31 (2023); *see also Planned Parenthood Ariz., Inc. v. Mayes*, 257 Ariz. 137, 142 ¶¶ 15–16 (2024).

**¶72**    This turn away from legislative intent is wise. As judges, we swear an oath to the Constitution and the law, not the intent of politicians. Ariz. Const. art. 6, § 26; A.R.S. § 38-231(E). We aren't trained to glean what they intended when enacting statutes. But we are trained to take text and determine its original public meaning. The rule of law requires we do only that. *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("We are governed by laws, not by the intentions of legislators.").

**¶73**    Three years ago, the supreme court's conflicting instructions—legislative intent vs. statutory text—came to a head. In *State ex rel. Arizona Department of Revenue v. Tunkey*, four justices rejected legislative intent in favor of statutory text. 254 Ariz. 432, 437–39 ¶¶ 23–32 (2023) (Bolick, J., concurring) ("the *Tunkey* Concurrence"). The *Tunkey* Concurrence explained that we should "apply a plain meaning approach to statutory interpretation going forward." *Id.* at 437 ¶ 24.

¶74        To the *Tunkey* Concurrence, the rule of law and separation of powers compels a textual approach for four reasons.  One, only "the words of a statute . . . are the law."  *Id.* ¶ 26.  Two, "[l]egislative intent is at best amorphous and at worst illusory."  *Id.* ¶ 27.  "The quest [for legislative intent] is inherently subjective and therefore corrosive of the rule of law, for it licenses judges to credit not what the legislature said through the words it enacted but what it meant to say."  *Id.* at 437–38 ¶ 27.  Three, seeking legislative intent "invites imprecision in legislative drafting if we appear to be at the ready to rescue a poorly drafted statute with a sharpened blue pencil."  *Id.* at 438 ¶ 27.  And four, "[w]e exceed our limited constitutional authority when we displace plain meaning with legislative intent."  *Id.*

¶75        But is the *Tunkey* Concurrence binding?  Yes.  Mere months ago, the supreme court adopted its approach and rejected legislative intent.  In *State v. Gordon*, the court rejected the dissent's reliance on a Georgia Court of Appeals' opinion, which said that among interpretative rules "the most important . . . is to construe the statute so as to give effect to the legislature's intent."  ___ Ariz. ___ , ___ , 581 P. 3d 215, 222 ¶ 28 (2025) (quoting *Brogdon v. State*, 683 S.E.2d 99, 104 (Ga. App. 2009)).  The majority said that "approach permits a court to ignore the plain meaning of the text if it perceives a departure from legislative intent."  *Id.* ¶ 29.  Citing the *Tunkey* Concurrence, the majority explained that we instead look to "the text of a statute to discern a legislative purpose absent ambiguity because the plain meaning of the text itself reflects the intent of the Legislature."  *Id.*; *see also State v. Marner*, ___ Ariz. ___, ___ , 2026 WL 249230, at *4 ¶ 19 (2026) ("The words in a statute are not evidence of a legislator's intent, rather they are law that judges apply[.]").  So absent ambiguity, Arizona courts ignore legislative intent and focus instead on text and context.

¶76        The same principles should apply when interpreting statutes stemming from ballot measures.  But for now, opinions saying we consider electorate intent in that context remain binding.  *See Green*, 248 Ariz. at 135 ¶ 9.  In fairness, the supreme court hasn't had occasion to correct course post *Gordon*.  But when that opportunity comes, the court should do so.

¶77        After all, "we apply the same interpretive standards to initiatives as we do to statutes."  *Id.*  Based on that equal-treatment rule, we should look to text—not electorate intent—when interpreting ballot measures.  *See Gordon*, 581 P.3d at 222 ¶ 28.

¶78        But even without an equal-treatment rule, the reasons for looking to text for legislative statutes apply equally to ballot measures.  One, only "the words" voters adopt "are the law."  *See Tunkey*, 254 Ariz. at 437 ¶ 26 (Bolick, J. concurring).  Two, "[voter] intent is at best amorphous

and at worst illusory." *See id.* ¶ 27. If we can't glean what tens of legislators intend when enacting a statute, we can't glean what millions of people do when approving a ballot measure. That "quest is inherently subjective and therefore corrosive of the rule of law, for it licenses judges to credit not what the [voters] said through the words [they] enacted but what [they] meant to say." *See id.* at 437–38 ¶ 27. Three, seeking voter intent "invites imprecision in [ballot measure] drafting if we appear to be at the ready to rescue a poorly drafted [ballot measure] with a sharpened blue pencil." *See id.* at 438 ¶ 27. And four, "[w]e exceed our limited constitutional authority when we displace plain meaning with [electorate] intent." *See id.*

¶79 When it can, the supreme court should clarify that electorate intent isn't our primary consideration when interpreting statutes stemming from ballot measures. Only text is.

## II.

¶80 The second point is case specific. Two more interpretative canons weigh against the way the Cities interpret the 2006 Act.

¶81 First, local governments "'have only such legislative powers as have been expressly, or by necessary implication, delegated to them by constitution or by the legislature.'" *Vangilder v. Ariz. Dep't of Revenue*, 252 Ariz. 481, 488 ¶ 24 (2022). So legislative delegations to local governments are "strictly construed." *Id.*; s*ee also Green*, 248 Ariz. at 135 ¶ 9.

¶82 Second, those delegating extraordinary powers usually do so clearly. In other words, "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *See West Virginia v. E.P.A.*, 597 U.S. 697, 723 (2022). The judiciary presumes those who enact laws—in Arizona, the legislature and the people—delegate major policy decisions using clear language. *See id.; see also Roberts v. State*, 253 Ariz. 259, 270 ¶ 40 (2022) (adopting the major questions doctrine). The U.S. Supreme Court assumes Congress doesn't "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). We should assume Arizonans don't either.

¶83 The Cities' interpretation stumbles over both canons. The Cities think the phrase "minimum wages" repealed the voter-approved Prevailing Wage Prohibition and granted them power to contractually mandate wages. But we must strictly construe the Local Permission Provision's delegation, *see Vangilder*, 252 Ariz. at 488 ¶ 24, and assume the people intended to delegate only those powers reflected in text, *see Roberts*, 253 Ariz. at 270 ¶ 40. If the people had displaced a law they enacted in 1984

to delegate the broad authority the Cities now claim, they would have done so more clearly.

### III.

¶84        And the third point is this: we shouldn't interpret initiatives in a way few (if any) voters would have anticipated.

¶85        In Arizona, "[d]irect lawmaking through referendum, initiative, or legislative referral, each of which is enshrined in the Arizona Constitution, is an important component of the separation of powers[.]" *Lane v. City of Scottsdale*, 258 Ariz. 460, 469 ¶ 33 (App. 2024) (Catlett, J., specially concurring). "But voters have a concomitant interest in voting with eyes wide open and in not being led astray by false or misleading election materials[.]" *Id.*

¶86        Section 19-102(A) regulates "[t]he form of petition for a law or amendment to the constitution of this state or county legislative measure, or city or town ordinance . . . proposed by the initiative to be submitted directly to the electors[.]"   And it "requires that such forms contain a . . . description of the principal provisions of the ballot measure." *Lane*, 258 Ariz. at 470 ¶ 38 (Catlett, J., specially concurring). "[W]hen analyzing the . . . description on initiative petition forms, we ask whether [it] 'either communicates objectively false or misleading information or obscures the principal provisions' basic thrust.'" *Id.*   Similarly, the ballot language must "contain a summary of the principal provisions of the measure, not to exceed fifty words[.]"   A.R.S. § 19-125(D). "[P]roper ballot language must be 'neither false nor clearly misleading,' and should 'reasonably be regarded as an attempt to provide necessary and appropriate information to the voting public.'" *Lane*, 258 Ariz. at 466 ¶ 16.

¶87        Again, under the Cities' view, the 2006 Act displaced a statewide ballot measure and returned broad power to certain local governments to impose prevailing wages.  Yet one would search in vain for any mention that the 2006 Act would do so in any of the ballot materials provided to the public.  Nothing in the petitions circulated to get the 2006 Act on the ballot told the public that the Act would displace the Prevailing Wage Prohibition—which likely would've made § 23-364(I) a principal provision. *See* Ariz. Sec'y of State, *I-13-2006 [Prop. 202] Application for Initiative or Referendum Petition Serial Number*, 1 (Nov. 18, 2005), https://apps.azsos.gov/election/2006/info/I-13-2006-full.pdf.   Nothing in the Secretary of State's publicity pamphlet alerted voters that the 2006 Act would grant local governments the power the Cities now claim. *See*

*2006 Publicity Pamphlet*, *supra*, at 101–13.  And nothing on the ballot notified voters that a "yes" vote would grant the Cities that power.  *Id.* at 114.

¶88     So it is unlikely anyone voting "yes" understood that the 2006 Act would operate as the Cities now claim.  And with that improbability, along with everything else we've said, the Cities' interpretation fails.  One might even say it goes down in flames.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:          JR